IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOHN LEE ROBINSON, Jr.,　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　　　)　　Civil No.   12-cv-842-DRH-CJP
　　　　　　　　　　　　　　　　　　　　)
CAROLYN W. COLVIN,　　　　　　　　　)
Acting Commissioner of Social Security,　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Defendant.[1]　　　　)

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to Chief Judge David
R. Herndon pursuant to 28 U.S.C. § 636(b)(1)(B).

In accordance with 42 U.S.C. § 405(g), plaintiff John Lee Robinson, Jr., seeks
judicial review of the final agency decision denying him Disability Insurance Benefits
(DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Mr. Robinson applied for benefits in November, 2008, alleging disability
beginning on November 21, 2007.   (Tr. 24).   After holding an evidentiary hearing, ALJ
Joseph L. Heimann denied the application for benefits in a decision dated January 21,
2011.   (Tr. 24-38).   The Appeals Council denied review, and the decision of the ALJ
became the final agency decision.   (Tr. 1).   Administrative remedies have been

---

[1] Carolyn W. Colvin was named Acting Commissioner of Social Security on February 14, 2013. She is
automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g) ("Any action
instituted in accordance with this subsection shall survive notwithstanding any change in the person
occupying the office of Commissioner of Social Security or any vacancy in such office.").

exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.    The ALJ erred in not giving greater weight to the opinions of Drs. Connors and Ampadu, not citing evidence to support his assessment of plaintiff's residual functional capacity, and not including all limitations supported by the evidence.

2.    The ALJ failed to properly evaluate plaintiff's credibility.

3.    The ALJ did not ask the vocational expert to clarify an apparent conflict between his testimony and the *Dictionary of Occupational Titles*.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   **42 U.S.C. §423(d)(3).**

---

[2]   The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).** *See also Zurawski v. Halter*, **245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Mr. Robinson was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996**) (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995**)).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971)**.

In reviewing for "substantial evidence," the entire administrative record is taken

into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   ***Brewer v. Chater***, **103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, ***Parker v. Astrue***, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Heimann followed the five-step analytical framework described above.   He determined that Mr. Robinson had not been engaged in substantial gainful activity since the date of his application.   He found that plaintiff had severe impairments of degenerative disc disease of the lumbosacral spine, spondylosis of the cervical spine, somatoform disorder, hyperlipidemia, adjustment disorder with mixed emotional features, and a remote history of alcohol abuse.   He further determined that his impairments do not meet or equal a listed impairment.   The ALJ found that Mr. Robinson had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with some limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work.   He was, however, not disabled because he was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Report and Recommendation.   The following summary of the record is

directed to the points raised by plaintiff.

### 1.    Agency Forms

Plaintiff was born in 1969, and was 38 years old on the alleged onset date of November 21, 2007.   (Tr. 250).   He was insured for DIB through December 31, 2009. (Tr. 251).

Plaintiff said he stopped working on November 21, 2007, because he hurt his back on the job.   (Tr. 256).   He settled a workers compensation claim for $19,229.11.   (Tr. 221).   He was working as a ramp service clerk at the Denver airport at the time of his injury.   His longest job was as a custodian and assistant facility manager for the Denver Public Schools, from 1999-2003.   (Tr. 257).

In December, 2008, plaintiff was living in Denver, Colorado, but was homeless. (Tr. 275).   In March, 2009, he was living with his sister in Centreville, Illinois.   (Tr. 302). He indicated that his daily activities consisted of watching television in bed and sitting around at a friend's house.   (Tr. 295).     He said he used a cane which had been prescribed in May, 2008.   (Tr. 301).

In May, 2009, Mr. Robinson said he had constant pain in his back, legs and neck, with weakness and numbness in his left leg.   He had daily headaches.   He also had depression and short term memory loss.   He had to change positions often to relieve pain and stiffness in his back and legs.   He used a cane "at all times to ambulate."   He had difficulty concentrating and difficulty getting along with people because of mood swings.   (Tr. 321).

### 2.    Evidentiary Hearing

Mr. Robinson appeared with a nonattorney representative at the evidentiary hearing on December 16, 2010.   (Tr. 64).

At the time of the hearing, he was living with his girlfriend and 18 year-old daughter.   His girlfriend and daughter did all the household chores.   (Tr. 75-76).

After Mr. Robinson got his GED in 2004, he took classes at a community college. He was studying criminal justice.   He had about 31 hours of college credit.   (Tr. 126).

Plaintiff testified that he had back pain and swelling, pain and numbness in his left leg.   He used a TENS unit for back pain.   (Tr. 77-78).   He testified that he used a cane everywhere he went, and it had been prescribed by Dr. Ampadu.   (Tr. 98-99).   He then said it had been prescribed by Dr. Artist in Colorado.   (Tr. 99-100).

Mr. Robinson had a prior claim for disability which was denied in 1994.   He continued working after that claim was denied.   Another claim was denied in 1998, and he continued working.   He was still looking for work at the time of the hearing.   He testified that he applied for jobs on-line every day.   He believed he could do a customer service job where he was sitting down and talking on the phone.   (Tr. 91).

With his cane, plaintiff could walk "all day."   He could stand for only 10 or 15 minutes.   (Tr. 101).

He was going to counseling at Chestnut Hill because he was depressed and thought about killing himself.   (Tr. 103).   He was taking Cymbalta, which helped, but it wiped him out and made him feel like a zombie.   (Tr. 105-107).

The ALJ questioned plaintiff about a medical record dated July, 2010, which said that plaintiff was driving an ice cream truck a few days a week.   He denied it.   (Tr.

116).   He collected unemployment benefits until the first quarter of 2010.   Plaintiff acknowledged that, in order to collect unemployment, he had to say that he was fit and able to work.   He said he was applying for jobs, but no one would hire him.   (Tr. 118-119).

A vocational expert (VE) testified that some of Mr. Robinson's past work was semi-skilled.   (Tr. 128).   The ALJ asked him to assume a person who could do work at the light exertional level, limited to occasional postural activities except no climbing of ladders, ropes or scaffolds, and limited to simple routine tasks with no interaction with the public.   (Tr. 129).   The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which he could do.   (Tr. 129).   The ALJ then asked the VE to assume a person who was limited to sedentary work, with all other assumptions being the same.   The VE testified that such a person could do sedentary, unskilled jobs such as hand packer and production worker/assembler.   (Tr. 130).

The VE testified that his testimony was consistent with the *Dictionary of Occupational Titles.*   (Tr. 132).

### 3.   Medical Treatment

Mr. Robinson was seen at Denver Health Medical Center at DIA on November 23, 2007, for low back pain.   He had been working as ramp service clerk on November 21, 2007, and hurt his back while moving a heavy piece of luggage.   The assessment was lumbar strain.   (Tr. 598-599).   He was treated by several doctors at this facility, including Dr. Lori Szczukowski, Dr. David Blair, and Dr. Rick Artist.   He was

prescribed medication and physical therapy, and was returned to light duty work on November 29, 2007.   (Tr. 596).   In December, 2007, an MRI showed slight bulging at L5-S1, with no obvious nerve impingement or foraminal impingement.   (Tr. 594).   On December 28, 2007, Dr. Artist's assessment was lower back strain with no structural problems noted on MRI and CT.   He was to continue with physical therapy and was given a referral to a physiatrist.   (Tr. 592).

In February, 2008, Dr. Szczukowski noted that he was seeing Dr. Conforti for osteopathic manipulations.   He was also being seen by Dr. Schakaraschwili, a physiatrist, who had done a nerve conduction study and MRI.   Both were normal.   His restrictions were lessened.   (Tr. 587).   In March, 2008, Dr. Schakaraschwili noted that he was working part-time driving an ice cream truck, and he was going to school.   Dr. Schakaraschwili had given him some facet injections.   (Tr. 586).

Dr. Szczukowski gave him restrictions of occasional lifting of 35 pounds and infrequent lifting of 50 pounds in April, 2008.   He was still going to physical therapy, and she recommended a lifting program of 50 pounds frequently and 70 pounds occasionally.   He was using an electrical stimulation unit and reported that he was 80% improved and was pain-free most of the time.   (Tr. 585).

Dr. Artist discharged plaintiff from care at Denver Health Medical Center at DIA on May 13, 2008.   Mr. Robinson reported that he was doing markedly better and had been pain-free for a week or so.   He was able to do his regular activities.   (Tr. 580).

Dr. Schakaraschwili saw plaintiff on May 21, 2008.   He noted that plaintiff had undergone repeat medial branch blocks at L4-5 and L5-S1, with only mild pain

reduction.   He had elected not to have a rhizotomy procedure.   He was deemed to be at maximum medical improvement.   His back pain waxed and waned.   Dr. Schakaraschwili was unsure whether his pain was caused by the lumbar facets or the sacroiliac joints, but it generally resolved on its own.   On exam, he had mild tenderness to palpation at the lumbosacral junction.   Straight leg raising was negative.   Strength and sensation were intact in the lower extremities.   He was released to work with restrictions of lifting no more than 40 pounds frequently and 60 pounds occasionally, with no frequent bending and twisting.   He was prescribed Celebrex and Ultram to take as needed.   (Tr. 620).

Plaintiff returned to Dr. Schakaraschwili in July, 2008, complaining of increasing back pain.   Medial branch blocks were again done at L3 to L5.   He again declined facet rhizotomy procedures.   Dr. Schakaraschwili felt he had possible lumbar facet syndrome versus sacroiliac joint dysfunction, and indicated he had nothing else to offer him in September, 2008.   (Tr. 611-617).

Mr. Robinson returned to Dr. Artist in February, 2009, complaining of severe back pain "all day, every day."   On exam, he had a very limited range of motion of the back and was diffusely tender from the trapezi to the iliac crests.   Dr. Artist suspected fibromyalgia.   (Tr. 663).   In July, 2009, Mr. Robinson went to the hospital with chest pains.   A stress test was negative.   The diagnoses included atypical chest pain, obstructive pulmonary disease secondary to cigarette smoking, and obesity.   (Tr. 972). Plaintiff next saw Dr. Artist in October, 2009.   He complained of back pain along with pain and numbness in his left leg down to his foot.   He also complained of neck pain.

He told Dr. Artist that he had a heart attack in July.   He was using a cane.   (Tr. 886-887).

Mr. Robinson started seeing Dr. Steven Connors, a chiropractor, in June, 2009. (Tr. 780).   Dr. Connors treated him about 9 times through July 6, 2009.   (Tr. 780-789). Dr. Connors treated him about 45 times between July 8, 2009, and October 30, 2009.   (Tr. 936-958).   On the last visit, plaintiff reported that he had improved, and the objective findings were improving.   (Tr. 958).

Dr. Gregory Smith, a pain management specialist, first saw plaintiff in August, 2009.   Dr. Smith noted that plaintiff complained of decreased sensation in his hands, arms, feet and legs.   However, the findings on neurologic exam were normal.   (Tr. 825-827).   An MRI of the cervical spine showed mild spondylosis.   An MRI of the lumbar spine showed mild foraminal narrowing at L4-5 and L5-S1.   There was no disc herniation.   (Tr. 896-897).   In September, 2009, plaintiff reported neck and back pain, with neck pain as his greatest complaint.   Dr. Smith noted that the MRI studies showed only mild degenerative changes.   On exam, his cervical range of motion was fairly well maintained.   He was tender at the cervicothoracic junction.   He had nonspecific low back discomfort with deep palpation.   Dr. Smith said he did not need any invasive therapy, and prescribed physical therapy and Tramadol.   (Tr. 898-899).   On October 26, 2009, Dr. Smith again explained that there was no significant neural impingement.   (Tr. 900-901).

Plaintiff began seeing a psychiatrist, Dr. Sanghee Kim-Ansbro, in September, 2009, on a referral from his primary care physician.   Plaintiff told Dr. Kim-Ansbro that

he had herniated discs in his cervical and lumbar spines, and that he had a heart attack in July, 2009.   He said that he had felt "down" since he hurt his back.   He had thought about suicide in the past, but no longer did.   He had never made a suicide attempt.   He was easily upset and worried a lot.   On mental status exam, he was goal-directed and his speech was coherent and relevant.   He denied delusions, hallucinations and suicidal or homicidal thoughts.   He was alert and oriented.   He appeared to be of average intelligence.   Remote and recent memory were fair.   His judgment and insight were impaired.   The diagnoses were major depressive disorder, recurrent, and alcohol dependence in remission.   Dr. Kim-Ansbro prescribed duloxetine (Cymbalta).   (Tr. 858-860).      On November 17, 2009, plaintiff's mood was "okay" and he was volunteering two days a week at a daycare facility at a sister's house.   He applied for social security disability because he "cannot find a job."   (Tr. 910).   In January, 2010, he told Dr. Kim-Ansbro that he was upset about being denied for social security.   His medication was changed to desvenlafaxine (Pristiq).   (Tr. 1130).   In February, 2010, he was doing better on this medication.   (Tr. 1129).

Mr. Robinson went to the emergency room in May, 2010, complaining of coughing up blood and feeling weak.   (Tr. 1081).   The diagnoses were weakness, chest pain (not otherwise specified) and acute bronchitis.   (Tr. 1084).   The nursing notes describe plaintiff as "very loud, obnoxious, and attention seeking." (Tr. 1085).   It was also noted that he had not taken any medications for 6 months.   (Tr. 1086).

In July, 2010, plaintiff told Dr. Kim-Ansbro that he had stopped taking his medication because Pristiq "caused his organs to shut down and he ended up in the

hospital for a few days."   He was driving an ice cream truck a few days a week.   He did not want to try any more antidepressant medication, but was interested in counseling.   (Tr. 1127).   There are no records of a hospital stay for a shut-down of plaintiff's organs.

Plaintiff saw Dr. Phillip Greene at Southern Illinois Healthcare in September, 2009.   He complained of a constant backache with prolonged standing and sitting.   His x-rays showed "just age-related osteoarthritis."   He had a full range of motion of the back, trunk and lower extremities.   Straight leg raising was negative and he had no back tenderness. His gait was normal.   Dr. Greene felt that his pain was almost definitely postural, and noted that he was "so physically decompensated that I suspect this is what is causing his problem."   (Tr. 1046).

On November 23, 2009, plaintiff saw Dr. Gregory Smith of Pain Management Services.   Imaging studies showed degenerative changes with no high grade neural impingement.   Dr. Smith said that he could not identify any focal area of pathology that required invasive treatment.   On exam, he was neurologically intact in the lower extremities.   Dr. Smith concluded that "Although this patient continues to report continued pain, I have been unable to identify a specific etiology.   In this regard, I feel there is nothing else I can offer this patient other than [to] provide narcotic analgesics." (Tr. 1077-1078).

Plaintiff was treated by Dr. Charles Ampadu at Southern Illinois Healthcare.   On December 4, 2009, he complained of back pain and weakness in both legs.   Dr. Ampadu ordered another lumber MRI.   (Tr. 1073).   This study showed minimal disc bulging at

L3-4 and L5-S1.   There was no evidence of disc protrusion, and no compression of the thecal sac or neural foramen.   (Tr. 1079).   On January 22, 2010, Dr. Ampadu reviewed the MRI results and noted that it showed "minimal bulging disc of L3-L4."   (Tr. 1071). In March, 2010, he brought disability forms for the doctor to fill out.   He complained of low back pain and left-sided weakness.   (Tr. 1070).

Dr. Ampadu continued to see Mr. Robinson in 2010 for complaints of back pain, leg weakness, atypical chest pain and depression.   The doctor's hand-written notes document plaintiff's complaints but contain little in the way of objective findings.   (Tr. 1148-1150).

### 4.   Consultative Examinations

Vittal Chapa, M.D., examined plaintiff on April 4, 2009.   His findings were normal.   Notably, plaintiff told him that he had no feeling in his left leg and had been using a cane since his injury in 2007.   However, he had no muscle atrophy in the left leg. Dr. Chapa said he would expect to see atrophy if plaintiff had been using a case since 2007.   His sensory examination was described as "inconsistent."   Dr. Chapa noted that nerve conduction tests showed no evidence of lumbar radiculopathy.   (Tr. 687-691).

Harry J. Deppe, Ph. D., performed a psychological exam on April 9, 2009.   Mr. Robinson told him that he had earned an associate's degree in criminal justice at a community college in Colorado.   The findings on exam were essentially normal.   Dr. Deppe concluded that Mr. Robinson had intact ability to relate to others, to understand and follow simple instructions, and to maintain attention required to perform simple, repetitive tasks.   He had fair to good ability to withstand the stress of day-to-day work

activity.   The Axis I diagnoses were alcohol dependence in remission and adjustment disorder with mixed emotional features.   (Tr. 692-696).

### 5.    RFC Assessments

In September, 2009, a state agency consultant opined that plaintiff could do light work limited to only occasional postural activities.   (Tr. 861-868).

A state agency psychologist assessed plaintiff's mental RFC.   He concluded that plaintiff had moderate limitations with respect to carrying out detailed instructions, but he was able to do work that involved only simple tasks.   (Tr. 847-849).

### 6.    Opinions of Treating Doctors

In November, 2009, Dr. Artist opined that Mr. Robinson could sit and stand/walk for 6 hours a day, but needed to alternate sitting and standing at will.   He could lift 40 pounds frequently and 60 pounds occasionally.   In response to a question about whether plaintiff's pain was such that it would prevent him from sedentary work, Dr. Artist said "no."   (Tr. 903-906).

In March, 2010, Dr. Ampadu opined that Mr. Robinson could sit and stand/walk for less than 1 hour a day, and needed to alternate sitting and standing at will.   He was unable to use his hands for grasping, pushing and pulling, or fine manipulations, and was unable to use his feet for repetitive movements.   He could lift 5 pounds frequently and 20 pounds occasionally.   He could never climb, stoop, kneel, crouch, crawl or reach above shoulder level.   Dr. Ampadu wrote that he had "left sided body weakness limiting mobility and causing severe fatigue."   Dr. Ampadu also said that plaintiff had a bulging lumbar disc which caused "severe constant pain" and his pain would prevent

him from working at a sedentary position.   The pain would make him unable to do even simple, unskilled work .   (Tr. 1065-1068).

Chiropractor Steven Connors also said that Mr. Robinson could sit and stand/walk for less than 1 hour a day, and needed to alternate sitting and standing at will.   He thought that Mr. Robinson had no difficulty using his hands for grasping and fine manipulations, and was able to use his right foot for repetitive movements.   He also thought that plaintiff could occasionally crawl and reach above shoulder level.   His report was dated November 18, 2009.   (Tr. 917-918).

### 7.   Records Not Before the ALJ

The transcript contains medical records that were not before the ALJ.   As of the time the ALJ issued his decision, the medical records consisted of Exhibits 1F through 49F, i.e., Tr. 405 through 1171.   See, List of Exhibits attached to ALJ's decision, Tr. 42-26.

Plaintiff submitted additional records to the Appeals Council, which considered them in connection with his request for review.   See, AC Exhibits List, Tr. 5.   Thus, the medical records at Tr. 1172-1181, designated by the Appeals Council as Exhibits 50F and 51F, were not before the ALJ.

The medical records at Tr. 1172-1181 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, **22 F.3d 687, 689 (7th Cir. 1994).**   See also, *Getch v. Astrue*, **539 F.3d 473, 484 (7th Cir. 2008);** *Rice v. Barnhart*, **384 F.3d 363, 366, n. 2 (7th Cir. 2004).**

## Analysis

Plaintiff first argues that the ALJ should have given controlling weight to the opinions of two of the doctors who treated him, i.e., Drs. Ampadu and Connors.   In the alternative, he argues that the ALJ failed to apply the requisite regulatory factors in determining what weight they should be given.

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record.   *Clifford v. Apfel*, **227 F.3d 863 (7th Cir. 2000);** *Zurawski v. Halter*, **245 F.3d 881 (7th Cir. 2001).**

The version of 20 C.F.R. §404.1527(d)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [Emphasis added]

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability."   *Books v. Chater*, **91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).**   If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527.   Supportability and consistency are two important factors to be considered in weighing medical opinions.   See, 20 C.F.R.

§404.1527(d).[3]   In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record."   ***Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record.   ***Henke v. Astrue,* 498 Fed.Appx. 636, 639 (7th Cir. 2012);** ***Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007).**   If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he must apply the §404.1527(d) factors to determine what weight to give it.   ***Campbell v. Astrue,* 627 F.3d 299, 308 (7th Cir. 2010)**.   Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax."   ***Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008);** ***Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008).**

Dr. Connors is a chiropractor.   A chiropractor is not an "acceptable medical source."   20 C.F.R. §404.1513(a).   Rather, he is classified as an "other source." §404.1513(d).   This is significant because only acceptable medical sources can render "medical opinions."   §404.1527(a)(2).   Therefore, as the ALJ correctly noted, the rules for weighing medical opinions set forth in §404.1527(d) do not apply to Dr. Connors'

---

[3]  The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

opinion and Dr. Connors' opinion is not presumed to be entitled to controlling weight.

With regard to Dr. Ampadu, ALJ Heimann easily met and exceeded the "minimal articulation" standard.   After a detailed review of the medical evidence, he rejected Dr. Ampadu's opinion.   At Tr. 32-34, he gave the following reasons for his conclusion:

1.   The objective medical evidence, including results of lumbar MRI, lumbar x-ray, EMG and nerve conduction studies, did not support the opinion.

2.   Dr. Ampadu's opinion was based on accepting plaintiff's complaints as valid.

3.   Dr. Artist, who was most familiar with plaintiff's medical history, placed "very marginal" limits on plaintiff.

4.   Dr. Ampadu's opinion was contradicted by the opinions of the other doctors who treated plaintiff, including Drs. Greene, Smith and Schakaraschwili.

5.   Dr. Ampadu's opinion as to plaintiff's mental limitations was contradicted by the records of Dr. Kim-Ansbro, who is a psychiatrist.

6.   Plaintiff's treatment consisted only of conservative measures.

7.   Plaintiff's complaints about radiculopathy have been inconsistent.

Plaintiff makes only a vague argument that the ALJ did not sufficiently explain why he rejected the opinions Drs. Ampadu and Connors.   In light of the extensive discussion set forth in the ALJ's decision, this argument should be rejected.   The Court notes that plaintiff fails to acknowledge that the rule on weighing medical opinions does not even apply to Dr. Connors.   In addition, plaintiff's brief improperly asks the Court to consider the evidence that was not before the ALJ.

Plaintiff also attacks the RFC assessment for not including limitations based on his subjective complaints.   This argument rests on plaintiff's second point about the

ALJ's credibility assessment.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.   **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)**.   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."   **Schmidt v. Barnhart, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.**   Contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible."   **Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.   "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration."   **Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008).**

Most of plaintiff's argument on this point is directed to criticism of the use of "boilerplate language" in credibility determinations.   See, Doc. 19, pp. 16-18. However, the ALJ did not use the kind of boilerplate language that was at issue in cases such as **Parker v. Astrue, 597 F.3d 920 (7th Cir. 2010)**, and **Brindisi v. Barnhart, 315 F.3d 783 (7th Cir. 2003)**.   Therefore, his argument is irrelevant.

ALJ Heimann gave specific reasons for his conclusion that plaintiff's allegations were not credible.   He pointed out that Mr. Robinson sat for 80 minutes in the hearing without once getting up, and he admitted at the hearing that he could walk all day with his cane.   He had filed at least 3 prior applications for disability benefits, but always went back to work after the applications were denied.   He collected unemployment benefits during the period in which he claimed he was disabled; inconsistent statements regarding ability to work are relevant to a claimant's credibility.   See, *Richards v. Astrue*, 370 Fed. Appx. 727, 732 (7th Cir. 2010); *Knox v. Astrue*, 327 Fed. Appx. 652 (2009). He made other inconsistent statements regarding his education and his radicular symptoms.   He denied driving an ice cream truck part-time after the date of disability, but some records suggested he did.   Finally, his subjective complaints were contradicted by the medical records.

It is clear that the ALJ considered the relevant factors.   Plaintiff does not take issue with any of the reasons cited by the ALJ.   Rather, he argues generally that the ALJ should have more thoroughly analyzed plaintiff's credibility.   This is tantamount to no argument at all.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong."   *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).   ALJ Heimann's analysis is far from patently wrong.   It is evident that he considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony.   *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).

Lastly, plaintiff suggests that there was an apparent conflict between the VE's testimony and the *Dictionary of Occupational Titles*.   That argument is a red herring. First, plaintiff has not identified an actual conflict.   Secondly, even if there were a conflict, plaintiff has not demonstrated that it was an apparent conflict such that the ALJ was required to examine the VE about the conflict at the hearing**.   *Terry v. Astrue***, **580 F.3d 471, 478 (7th Cir. 2009).**

In sum, plaintiff's arguments are, in effect, nothing more than an invitation for the Court to reweigh the evidence.   However, the reweighing of evidence goes far beyond the Court's role.   Even if reasonable minds could differ as to whether Mr. Robinson is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence.   *Shideler v. Astrue***, 688 F.3d 306, 310 (7th Cir. 2012)**; *Elder v. Astrue***, 529 F.3d 408, 413 (7th Cir. 2008).**

## <u>Recommendation</u>

After careful review of the record as a whole, the Court is convinced that ALJ Heimann committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the undersigned recommends that the final decision of the Commissioner of Social Security denying John Lee Robinson, Jr.'s application for disability benefits be **AFFIRMED** and that judgment be entered in favor of defendant.

Objections to this Report and Recommendation must be filed by **November 15, 2013**.

**Submitted:   October 28, 2013**.

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**